## Berry v. Thring et ux.

*J. L. Stern,* for plaintiff.

*Price & Propper,* for defendants.

Boκ, P. J., October 31, 1950.—Because of the particular and somewhat peculiar facts of this case, we agree with the chancellor's findings and conclusions.

The bill sought specific performance of a contract to sell real estate. This relief was refused, and plaintiff does not complain. Nor does he complain of giving up $400 of the down money that he paid under the contract. The only complaint before us is that of defendants, who object to being made to repay $800 of the down money to plaintiff.

Plaintiff was the buyer, defendants the sellers, one of the latter being the wife. The transaction was between the two men, who were good friends. Defendant was a man of means, plaintiff not, and it is clear from the testimony of both that while defendant was selling at a good price, he was happy to have his friend turn a penny for himself on a resale if he could: defendant could have rescinded the contract long before he did, due to plaintiff's failure to perform, and the market was rising.

The contract, dated February 10, 1947, contained the following provisions:

"SETTLEMENT to be made on or before sixty days after approval of agreement and the said time is hereby agreed to be of the essence of this agreement. Should the purchaser fail to make settlement as herein provided or default in performing any other covenants or conditions of this agreement, the sum or sums paid on account of the purchase price may be retained by the seller as liquidated damages or on account of the purchase price, as the seller may elect, and, if retained as liquidated damages, this contract shall become null and void and cancellation shall automatically take place. Nothing herein mentioned or contained, however, shall limit or debar the seller from resorting to any appropriate remedy in law or in equity. . . .

"It is understood and agreed that should it be necessary to obtain an extension for a further period of sixty days, same will be granted upon payment of an additional $200.00."

Down payments were made as follows, all in 1947:

February 10, $200; May 2, $200; July 23, $200; August 4, $200; October 6, $400; total, $1,200.

No date for settlement was fixed when any of the last three payments was made.

Based on the extension arrangement in the contract, the $1,200 paid by plaintiff would have bought him time to settle until February 10, 1948. Plaintiff could not and did not settle by then, and defendant did nothing to rescind until May 27, 1949, 15 months later, when he wrote plaintiff and set a time limit of June 30th, a bit more than a month after. Apparently plaintiff did not take the letter seriously, after having been carried so long already, and in December 1949, he managed to get a buyer. This buyer called defendant, who told him that plaintiff had no rights and then sold the property to him. This sale was for $7,300; the contract between plaintiff and defendant called for $7,000.

If we have any quarrel with the chancellor, it arises from his statement that it makes no sense that defendant agreed to let the matter run until plaintiff could find a buyer. It seems to us that this is just about what did happen for at least 15 months. Defendant himself said that he let himself be put off by plaintiff's excuses, and even discouraged real estate men who wanted to buy the property by telling them that plaintiff had bought it. During the long waiting period plaintiff did get a buyer, a Mrs. Cummings, but she could not complete the deal and agreed to the final attempted sale to Richards.

The contract set the dates and the amount of the liquidated damages, and it is clear to us that the parties

abandoned that program when they let the matter drift for so long. Defendant seeks to justify the retention of 17 percent of the price on the theory of liquidated damages, but he has offered no testimony that the actual damages were anything like this amount. If his tenant was in arrears, it was his affair: he had the power to rent it more profitably if he wanted to. Even the taxes for the whole period do not exceed the $400 that are the liquidated damages under the contract. Defendant spent nothing to repair the property until after he had rescinded.

If his argument is honored, he would have the rent, the $1,200, the buyer whom plaintiff had dug up, and the $300 increased price from that buyer. The length of time that elapsed was his own doing. We feel that under the circumstances the extra $800 represents installments on the purchase price and not a penalty.

Defendant asserts that the prayer for general relief in the bill is not broad enough to justify a money judgment, and cites Mansfield v. Redding et al., 269 Pa. 357 (1921). The instant bill for specific performance was dismissed as to that remedy, and the cited case is authority for that action. But from testimony in that case the following appears:

"Mr. Stern: If Your Honor please, in our prayer we asked for specific performance of the agreement of sale and also for such other relief as your Honor might think proper. May I assume that under such other relief there would be included also the possibility of refund of deposit if your Honor felt it was a penalty or—

"The Court: I think so.

"Mr. Stern: Thank you."

To this there was no objection or comment. This is not a jurisdictional point, since the court, in Mansfield v. Redding, supra, denied money relief only because it had not been properly pleaded.

The $400 expressly named as liquidated damages in the contract was forfeited under the authority of Wasserman v. Steinman et ux., 304 Pa. 150 (1931). But the rest of the payments, $800, stands on a different footing: no extension was ever agreed upon, orally or in writing, and the fact that the parties did avail themselves of the one extension provided for in the contract is some indication that when they made and accepted further payments without any formal extension, they intended the extra payments to be on a different footing—payments on account rather than liquidated damages.

As the court said, in Vito v. Birkel, 209 Pa. 206 (1904):

"No doubt the grantor or lessor may waive the forfeiture either expressly or by estoppel arising from acts tending to mislead the grantee or lull him into the belief that strict performance will not be exacted."

To take 17 percent of the purchase price and then do nothing for over a year is the best possible way to lead a man's buyer into thinking that strict performance will not be exacted.

The case of Axford v. Thomas et al., 160 Pa. 8 (1894), holds that whether there was a waiver of the forfeiture is a question of fact.

This is not a case of a buyer who refuses to buy and then sues to recover his payments, like Sanders v. Brock, 230 Pa. 609 (1911). There the court said:

"The cases decided by this court and cited by the appellant do not conflict with the rule here announced. The action in those cases was sustained on the ground that there had been a rescission of the contract by the vendor or a mutual rescission by both parties, and that under the facts the purchaser was entitled ex aequo et bono to recover back the purchase money."

Samples of the cases referred to in the Sanders opinion are: Mathews v. Sharp, 99 Pa. 560 (1882);

Wotring v. Shoemaker, 102 Pa. 496 (1883), and Keck v. Bieber, 148 Pa. 645 (1892).

See Ellis v. Roberts et ux., 98 Pa. Superior Ct. 49 (1929) for an example of 15 percent of the purchase price being held to be a penalty rather than liquidated damages, even though given the latter name and provided for in the contract. In the instant case only $400 was provided for as liquidated damages, and no further damages were shown.

We consider the retention of $800, under the circumstances, to be inequitable.

The exceptions are dismissed. Eo die, the decree nisi is affirmed.